## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:06CR382 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| ARKETA WILLIS, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Arketa Willis (Willis) (Filing No. 22). Willis is charged in the Indictment along with co-defendant Darnell Tyler (Tyler) with interstate travel with the intent to distribute drug trafficking proceeds (Count I) in violation of 18 U.S.C. § 1952(a)(1) and a forfeiture count (Count III) in violation of 28 U.S.C. §246(c) and 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(A), and 1961(1) regarding $100,950.00 seized from a Dodge Durango on December 11, 2006. Willis seeks to suppress evidence obtained from a traffic stop, detention and search of a Dodge Durango which were conducted by officers of the Douglas County Sheriff's Office (DCSO) on December 11, 2006, on Interstate 80.

The court held a hearing on the motion on January 23, 2007. Willis was present for the hearing along with her CJA appointed counsel, Andrew J. Hilger. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. During the hearing, the court heard the testimony of DCSO Sergeant Edward Joseph Van Buren (Sergeant Van Buren). The court also received into evidence a videotape and CD of the traffic stop (Exhibits 1 and 1A). The parties requested and were given additional time in which to submit post-hearing briefs. A transcript (TR.) of the hearing was filed on January 31, 2007 (Filing No. 45). Willis filed a post-hearing brief on February 1, 2007 (Filing No. 46). The government notified the court on February 6, 2007, that the government would forgo the filing of a supplemental brief and rely upon its brief in opposition filed on January 19, 2007.

**FINDINGS OF FACT**

Sergeant Van Buren, a twenty-one year veteran with the DCSO, was patrolling Interstate 80 (I-80) in Omaha, Nebraska, on December 11, 2006 (TR. 6, 24). Sergeant Van Buren was performing routine criminal interdiction duties while performing his duties as a sergeant of the DCSO canine unit (TR. 6, 24). Sergeant Van Buren was traveling in a marked DCSO K-9 unit while in uniform and accompanied by his assigned canine, Rocky, a Belgian Malinois (TR. 8). Sergeant Van Buren described criminal interdiction duties as detecting criminal activity of persons who have been stopped for traffic violations to determine if they are wanted, or involved in terrorism, drug smuggling, gun smuggling, transport of stolen property, and similar criminal activity (TR. 7). Sergeant Van Buren has received training in attempts to detect such activity (TR. 8).

Sergeant Van Buren has been in the DCSO canine unit for five and one-half years and supervises five deputies who are assigned canines (TR. 6 - 7). Sergeant Van Buren conducts training for all the canines and their handlers and has a State of Nebraska certificate as an instructor (TR. 7, 9). Sergeant Van Buren also serves as an evaluator for canine handlers (TR. 12.) Sergeant Van Buren and his canine, Rocky, were paired in July 2006 (TR. 12). Sergeant Van Buren and Rocky have been certified as a drug detection team by the Nebraska State Patrol (TR. 17). Rocky was trained to detect marijuana, methamphetamine, cocaine and heroin (TR. 14). Rocky is a passive indicator, meaning that the dog will sit, stand and stare when he detects the odor of the controlled substance (TR. 19).

Around 8:20 a.m. on December 11, 2006, Sergeant Van Buren was parked westbound on the inside shoulder east of the 108th Street overpass on I-80 in Omaha (TR. 24). Sergeant Van Buren observed a Dodge Durango (Durango) westbound in the third lane from the inside shoulder abruptly make a lane change without signaling in advance (TR. 25). The Durango crossed over both solid white lines before any signal was observed (TR. 25). Sergeant Van Buren believed the maneuver by the Durango was a traffic violation of the Nebraska law requiring a signal of intent to change lanes at least 100 feet before the change (TR. 25). Sergeant Van Buren proceeded to catch up to the vehicle and in so doing determined that the Durango was also exceeding the posted speed limit of sixty

miles per hour in that Sergeant Van Buren estimated the speed of the Durango to be eighty to ninety miles per hour (TR. 26). Sergeant Van Buren activated his emergency lights and, eventually, the Durango pulled to the side of the interstate approaching Harrison Street and stopped (TR. 26-27).

Sergeant Van Buren's patrol vehicle was equipped with a video camera with audio (Exhibits 1 and 1A). Sergeant Van Buren approached the passenger side of the Durango and made contact with the driver (TR. 27). There were two occupants of the Durango, the driver, Tyler, and a front-seat passenger, Willis (TR. 27). Sergeant Van Buren asked Tyler to come back to Sergeant Van Buren's patrol vehicle (TR. 28). Tyler did so, had a seat in the patrol vehicle, and was advised by Sergeant Van Buren of the lane change violation and the speeding violation (TR. 28). Sergeant Van Buren noted the Durango was rented by Willis and conducted a check for wants and warrants for the occupants (TR. 29). As Sergeant Van Buren was conducting the checks and writing down information, he asked Tyler about Tyler's travel itinerary (TR. 29-30).

Tyler told Sergeant Van Buren that Tyler was traveling to Denver, Colorado, to visit Willis's grandmother who was sick (TR. 30). Tyler said the female passenger was his wife (TR. 30). Tyler also stated they had a child who was being watched by a relative (TR. 30). Although Tyler was from Jamaica and had a distinctive accent, Sergeant Van Buren had no difficulty in understanding Tyler (TR. 30). Tyler said they were going to be in Denver for just a day or two (TR. 31).

Sergeant Van Buren got out of the patrol vehicle and walked to the passenger side of the Durango to talk with Willis to verify who she was, her relationship to Tyler, and the itinerary (TR. 31). Willis verified she was the renter of the Durango and Tyler was her boyfriend (TR. 32). Willis said she had no children with Tyler and they were going to visit her grandmother in Denver for about a week (TR. 32). When Sergeant Van Buren began to ask some clarifying questions, Willis became uncooperative and refused to answer any other questions (TR. 32). Sergeant Van Buren went back to the patrol vehicle and asked Tyler about the discrepancies between his statements and those of Willis, i.e., that Willis and Tyler were married and that Willis and Tyler had children together (TR. 33). Tyler

stated he and Willis were engaged and did not specifically respond to the issue of the children (TR. 33).

Sergeant Van Buren asked if he could search the vehicle and was told by Tyler that he could and that everything in the Durango was Tyler's responsibility (TR. 34). Since Tyler was not the renter, Sergeant Van Buren went back to the Durango to get Willis's consent to search (TR. 34). Willis declined to consent to a search by Sergeant Van Buren (TR. 34). Sergeant Van Buren told Willis that Sergeant Van Buren was going to walk his drug detection dog around the Durango and he would like to wait for a back-up officer to arrive (TR. 34-35). Willis indicated to Sergeant Van Buren that would be okay (TR. 35). The in-car recording from Sergeant Van Buren's patrol vehicle would indicate the detention of Tyler and Willis to wait for a back-up officer to arrive occurred at 8:42:07 a.m. (TR. 36; Exhibits 1 and 1A). DCSO Deputy Bargstadt arrived at 8:47 a.m. and parked behind Sergeant Van Buren's patrol vehicle (TR. 39). DCSO Deputy Bruna also arrived on the scene and parked his patrol vehicle behind those of Sergeant Van Buren and Deputy Bargstadt (TR. 37).

Sergeant Van Buren reapproached the Durango and asked Willis to step out of the Durango and have a seat in Deputy Bruna's patrol vehicle while Sergeant Van Buren walked the dog around the Durango (TR. 40). Willis complied (TR. 41). Deputy Bargstadt walked around the Durango to "stem" the dog while Sergeant Van Buren had Rocky on a leash by the side of Sergeant Van Buren's patrol vehicle (TR. 41 -42). "Stemming" is an action by a handler or assistant to appear to be hiding an object on the vehicle without touching it to stimulate the dog (TR. 41). Sergeant Van Buren gave Rocky the command to sniff the Durango and proceeded to the passenger side of the Durango (TR. 45). Rocky sniffed the passenger side of the Durango and hesitated once, came around the front of the Durango to the driver's side door seam where he stopped (TR. 45). Rocky jumped up, put his paws near the upper part of the door, put his nose to the door seam and made a very nasal sniffing sound, then dropped down, stood and stared (TR. 45). Sergeant Van Buren testified Rocky's action constituted an indication for the presence of drugs (TR. 45 - 46). The time was approximately 8:51:07 a.m. (TR. 48; Exhibits 1 and 1A). Sergeant Van Buren returned Rocky to the patrol vehicle, advised Tyler and Willis that Rocky had alerted

to drugs in the Durango, and the officers were going to conduct a search of the Durango (TR. 48).

The officers searched the Durango and its contents (TR. 48). In the interior lining of the suitcases in the rear of the Durango, the officers found several individually plastic wrapped bundles of U.S. currency (TR. 49). The packages were consistent with packages of currency previously seized by Sergeant Van Buren in drug trafficking cases (TR. 49 - 50). Tyler and Willis were then arrested and taken back to the DCSO office at 156th and Maple Streets in Omaha (TR. 50). There Sergeant Van Buren placed the currency in a locker in a locker room with other non-contraband items (TR. 50-51). Rocky indicated to the locker containing the suspect currency (TR. 51).

## CONCLUSION OF LAW

The Eighth Circuit has "repeatedly held that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." *United States v. Mallari*, 334 F.3d 765, 766 (8th Cir. 2003) (internal quotation and citations omitted); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). "To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001). An officer has an objectively reasonable basis for stopping a motorist where the officer has a reasonable basis for believing that the driver has breached a traffic law. *Mallari*, 334 F.3d at 766 (**citing** *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996) and *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999) (officer's mistaken, but objectively reasonable belief that a traffic violation occurred supported traffic stop)). In the present case, Sergeant Van Buren observed the Durango to make an illegal lane change and exceed the posted speed limit, both are violations of the traffic laws. Accordingly, Sergeant Van Buren had probable cause to stop and detain the Durango.

Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and the issuing a citation. *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004); **see also** *United States v. Sokolow*, 490 U.S.

1, 7 (1989). Additionally, the police officer may inquire about the motorist's destination, purpose of the trip and whether the police officer may search the vehicle. *$404,905.00*, 182 F.3d at 647; *United States v. Allegree,* 175 F.3d 648, 650 (8th Cir. 1999). The police officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. *$404,905.00*, 182 F.3d at 647; *Allegree,* 175 F.3d at 650-51. "A short detention for a dog sniff after the completion of a traffic stop does not violate the Fourth Amendment." *United States v. Linkous*, 285 F.3d 716, 721 (8th Cir. 2002).

An investigative detention must be supported by a reasonable articulable suspicion of criminal activity. **See** *Terry v. Ohio*, 392 U.S. 1, 25-31 (1968); *Fuse*, 391 F.3d at 927-28.

> [The Eighth Circuit] has summarized the standards used to consider whether reasonable suspicion exists as follows:
> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. The totality of the circumstances -- the whole picture -- must be taken into account. We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which describe a very broad category of predominantly innocent [people].

*United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (internal citations and quotations omitted); **see also** *Illinois v. Wardlow*, 120 S. Ct. 673, 676 (2000). In *Wardlow*, the court noted that even where all of the suspect's conduct is lawful, if the

conduct is ambiguous and susceptible to an innocent explanation as well as creating a reasonable suspicion of criminal activity, police officers may detain the individual to resolve the ambiguity. *Id.* at 677. A "reasonable suspicion" must be more than an inchoate "hunch," nonetheless, the Fourth Amendment only requires law enforcement to articulate some minimal, objective justification for an investigatory stop. ***Sokolow***, 490 U.S. at 7. In determining whether Sergeant Van Buren's had reasonable suspicion, the court must consider the totality of the circumstances in light of Sergeant Van Buren's experience. **See *Fuse***, 391 F.3d at 929. "Although each factor giving rise to reasonable suspicion may appear innocent when viewed by itself, 'a combination of factors may warrant further investigation when viewed together.'" ***Id.*** (**quoting *Linkous***, 285 F.3d at 720); **see *United State v. Barragan***, 379 F.3d 524, 529 (8th Cir. 2004) (noting conflicting stories support reasonable suspicion for further detention). In this case, Sergeant Van Buren was faced with divergent information from Tyler and Willis as to their relationship, children, and reason for visiting a grandmother in Denver. Further, Sergeant Van Buren described Tyler's demeanor as nervous and evasive.

Tyler provided Sergeant Van Buren a consent to search the Durango which provided Sergeant Van Buren a basis to further detain the Durango. When Sergeant Van Buren walked to the Durango to obtain Willis' consent to search, he had not completed the issuance of any traffic citations for improper lane change or speeding at that time. When Willis declined to consent to the search of the Durango, Sergeant Van Buren informed Willis that he was going to perform a canine sniff of the Durango after a back-up officer arrived. While Willis did not protest, it cannot be said that her actions constituted a consent for the canine sniff since she was faced with a direction from a police officer that such a sniff would occur.

In a matter of minutes, the back-up officer arrived and Sergeant Van Buren conducted a canine sniff of the Durango. The canine sniff was preformed before the conclusion of the traffic stop as the citations had not yet been issued. Sergeant Van Buren believed he had reasonable suspicion in which to detain the Durango for a canine sniff because of the divergent stories of Tyler and Willis. Furthermore, the detention of Tyler and Willis, even if not based on reasonable suspicion, was *de minimus*. De minimus

intrusions do not amount to unreasonable seizures under the Fourth Amendment. **See United States v. Alexander**, 448 F.3d 1014, 1017 (8th Cir. 2006); **United States v. Martin**, 411 F.3d 998, 1000-02 (8th Cir. 2005).

The canine sniff of the vehicle did not constitute a "search" within the meaning of the Fourth Amendment. "A dog sniff is not a search within the meaning of the Fourth Amendment, and thus requires no probable cause to be performed." **United States v. Sanchez**, 417 F.3d 971, 976 (8th Cir. 2005) (**citing Illinois v. Caballes**, 543 U.S. 405 (2005). This is because "a canine sniff of the exterior of personal property in a public location 'is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.'" **$404,905.00,** 182 F.3d at 647 (**quoting United States v. Place**, 462 U.S. 696, 707 (1983) (luggage at an airport)). Furthermore, the principle also applies to the canine sniff of the exterior of a vehicle because "[t]he exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'" **Id.** (**quoting New York v. Class**, 475 U.S. 106, 114 (1986)). A police service canine's alert to the odor of drugs in a vehicle provides probable cause that drugs are present. **Place**, 462 U.S. at 706; **Sanchez**, 417 F.3d at 976 . After probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement. **Chambers v. Maroney**, 399 U.S. 42, 52 (1969); **Sanchez**, 417 F.3d at 976.

Willis asserts in her post-hearing brief that Rocky did not alert to the odor of drugs in the Durango (Filing No. 46, p.3). Such assertion is based upon Willis' observation of the in-car video of Sergeant Van Buren's patrol vehicle. The court finds Rocky is a well trained and certified drug detection canine based upon Sergeant Van Buren's unrefuted testimony regarding the training and certification of Rocky. Sergeant Van Buren clearly observed an alert by Rocky and so testified. The court credits Sergeant Van Buren's testimony in that regard. Accordingly, the court finds Sergeant Van Buren had probable cause to search the Durango after the alert by Rocky. The search and seizure of the items in the Durango was lawful, and Willis' motion to suppress should be denied.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

Willis's motion to suppress (Filing No. 22) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 8th day of March, 2007.

BY THE COURT:

 s/Thomas D. Thalken
 United States Magistrate Judge